**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

**HEATHER RENEA KITTS,**

     **Plaintiff,**

**vs.**                        **CIVIL ACTION NO. 1:20-CV-00630**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered September 29, 2020 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 19, 20, 22)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or for remand (ECF No. 19); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 22) **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Heather Renea Kitts (hereinafter referred to as "Claimant"), protectively filed her applications on June 26, 2017 (Tr. at 13, 233-234) alleging disability since January 8, 2016[1] because of chronic migraines, back and neck pain, numbness in her right leg, weakness in both hands, and inability to stand and sit for long periods of time (Tr. at 267). Her claims were initially denied on October 23, 2017 (Tr. at 97, 98, 121-126) and again upon reconsideration on December 14, 2017 (Tr. at 129-131, 132-134). Thereafter, Claimant filed a written request for a hearing on December 21, 2017 (Tr. at 137-138).

An administrative hearing was held on July 9, 2019, before the Honorable Geraldine H. Page, Administrative Law Judge ("ALJ") (Tr. at 36-72). On August 23, 2019, the ALJ entered an unfavorable decision (Tr. at 10-35). On October 16, 2019, Claimant sought review by the Appeals Council of the ALJ's decision (Tr. at 231-232). The ALJ's decision became the final decision of the Commissioner on July 22, 2020 when the Appeals Council denied Claimant's Request for Review (Tr. at 1-6).

On September 24, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and a Memorandum in Support of Judgment on the Pleadings (ECF Nos. 19, 20), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 22).

---

[1] In her application, Claimant alleged she stopped working on January 8, 2016 because of her chronic headaches and because her son was having trouble in school (Tr. at 267). However, the written decision provides an alleged onset date of January 1, 2016, per Claimant's testimony (Tr. at 15, 43).

Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was considered a "younger person" on the alleged onset date and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 28) Claimant has a high school education, and completed one year of college, though she did not obtain a degree. (Tr. at 28, 42-43, 268) Claimant briefly worked as a secretary for an accounting firm and last worked at First Community Bank as a proof operator. (Tr. at 43, 65)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

3

416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this case, the ALJ found Claimant met the insured status requirements through December 31, 2020. (Tr. at 15, Finding No. 1) At the first step, the ALJ determined that Claimant had not engaged in substantial gainful activity since the alleged onset date. (Id., Finding No. 2) At the second inquiry, the ALJ found Claimant had the following severe impairments: obesity; migraines; lumbar degenerative disc disease; generalized anxiety disorder; and major depressive disorder. (Id., Finding No. 3) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work except:

> the claimant can occasionally climb ramps and stairs, balance, kneel, crawl, stoop, and crouch; must avoid concentrated exposure to extreme temperatures; must avoid exposures to hazardous machinery, working at unprotected heights, climbing

ladders, ropes, and scaffolds, and working on vibrating services; cannot be exposed to excessively loud background noise such as heavy traffic and jackhammering type construction equipment in the immediate work environment; and may miss one day a month due to migraines. The claimant is able to understand, remember, and carry out simple instructions in repetitive, unskilled work; is able to attend, persist, and concentrate for two-hour segments with normal breaks as allowed by the employer, but is able to complete a normal eight-hour day/40-hour week in work that involves occasional interactions with the general public, coworkers, and supervisors, but the claimant is able to respond appropriately to supervision, coworkers, and usual work situations.

(Tr. at 18-19, Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing any of past relevant work. (Tr. at 28, Finding No. 6) In addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC, the ALJ determined that Claimant was capable of performing other jobs that exist in significant numbers in the national economy. (Tr. at 28-29, Finding Nos. 7-10) Finally, the ALJ determined that Claimant has not been under a disability from January 1, 2016 through the date of her decision. (Tr. at 30, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant argues that the ALJ not only failed to appreciate the progressive nature of her migraines, but also failed to explain how certain limitations in the RFC assessment accommodated this impairment, such as the avoidance of hazards, loud noises, and absenteeism no more than one day a month. (ECF No. 20 at 5-7) Additionally, Claimant contends that the ALJ gave no consideration of the side effects from her migraine medications, which made her sleepy. (Id. at 8) Claimant asks this Court to grant her motion and direct that she be found disabled or remand this matter for further proceedings. (ECF No. 19)

In response, the Commissioner argues that the ALJ provided a thorough review of the record concerning Claimant's chronic migraines, which included her medical history, treatment,

her activities of daily living as well as her testimony concerning her symptoms; the ALJ reviewed all this evidence in determining the appropriate RFC assessment, which allowed for even greater limitations than those endorsed by any provider of record. (ECF No. 22 at 12-17) Further, the ALJ did consider the side effects of Claimant's medications, and compared her allegations against the overall record, and appropriately found her allegations of disabling side effects unsupported. (Id. at 17-20) The Commissioner asserts the ALJ's decision is supported by substantial evidence and asks this Court to affirm. (Id. at 20)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Migraine Headache Treatment:

Two months prior to her alleged onset date, on November 20, 2015, Claimant saw her primary care provider, nurse practitioner Carolyn L. King, to follow up on her migraine headaches (Tr. at 450). Claimant reported one headache in the past two weeks and that Topamax had "really helped" (Id.). She reported being active with her children (Id.). A neurological examination was non-focal, and Ms. King continued Claimant on Topamax and Treximet (Tr. at 451).

A few weeks after her alleged onset date, on January 21, 2016, Claimant returned to Ms. King and reported that Topamax was helping her migraines (Tr. at 445), but she had three in the past two weeks (Tr. at 446). Claimant was coaching soccer and walking, and had lost 22 pounds since April (Tr. at 445). Ms. King increased Topamax at her request, and continued Treximet (Tr. at 445, 447). When Claimant followed up in April, her headaches were about the same; the lower

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

dose of Topamax was not helping, but she had blurry vision with the higher dose (Tr. at 427). A neurological examination was non-focal (Tr. at 428). Her Topamax was adjusted (Tr. at 431).

At a regular follow up with Ms. King in July 2016, Claimant reported a migraine the previous week and that she woke up with one that day (Tr. at 404). She reported a migraine about once a week, sometimes during the day (Id.). A neurological examination was non-focal (Tr. at 405). She was to continue Treximet and Topamax (Tr. at 406).

On August 12, 2016, Claimant presented to Roanoke Neurology for a new patient visit with nurse practitioner Sally Heffernon, reporting headaches since age 16, worsening over the years (Tr. at 348). She reported daily headaches associated with sensitivity to light and sound; nausea, but no vomiting; and blurry vision and/or diplopia with severe headaches (Id.). Claimant had no relief with over-the-counter medication; the best relief was from resting in a dark room (Id.). A neurological examination was unremarkable; Claimant was to try Elavil, and Ms. Heffernon discussed her dosages for Imitrex (Tr. at 349).

In November 2016, Claimant returned to Ms. King and reported that she had a headache at the appointment; that she had headaches daily; and that she can awaken with headaches (Tr. at 386). A neurological examination was non-focal (Tr. at 387). Claimant stated that she gained weight with Elavil, but Treximet helped (Tr. at 386). Plaintiff was to continue Elavil and Treximet (Tr. at 387).

On March 24, 2017, Claimant returned to Roanoke Neurology and met with nurse practitioner Connie Hurley (Tr. at 343). Claimant did not tolerate Topamax or Elavil due to side effects, and her headaches worsened on Propranolol (Id.). She reported nearly daily headaches of varying locations, and reported a difficult time "catching" headache onset with Imitrex (Id.). She

denied overuse of Goody's and continued to be fearful of Botox (Id.). Ms. Hurley noted: "She is asking about disability for her migraines. I told her that she is not fully treated for headache and our goal is to have to return to work/functioning life, not disability. She wants to know if she would qualify for disability if she takes more medication for headache and they are still uncontrolled. We discussed that I would recommend FMLA, not disability" (Id.). Claimant was to consider Botox treatments, continue Imitrex, and retry gabapentin (Tr. at 345).

On March 29, 2017, Claimant returned to Ms. King and reported that her headaches caused dizziness and blurry vision and were mostly in the temporal lobes, but sometimes occipital (Tr. at 382). She stated that her face would get numb and tingle when she had migraines, and sometimes her hands were numb; she denied memory loss (Id.). Ms. King noted that her migraines were progressively worsening and that she was seeing a specialist who changed her medication, but it was not helping yet (Id.). Claimant did not want Botox, despite her specialist's recommendation Id.). She was afraid to drive alone due to headaches and planned to apply for disability (Id.). However, Claimant also reported that she felt tired now because she had been taking care of two houses, as her neighbor had broken her wrist and Claimant was helping her (Tr. at 383). Claimant's husband had also broken his ankle, "so she has been taking on a lot" and caring for her children (Id.). Claimant was to continue Treximet and Neurontin (Tr. at 384).

On June 23, 2017, Claimant returned to Roanoke Neurology reporting daily headaches for the last month (Tr. at 342). She admitted Imitrex was helpful, but had not refilled her medication for three months (Id.). She tolerated gabapentin, but she still had headaches (Id.). She was exercising (Id.). A neurological exam was normal; her provider increased gabapentin, refilled Imitrex, and encouraged her to use all nine tablets (Tr. at 343).

On June 29, 2017, Claimant returned to Ms. King reporting "really bad" headaches, but a neurological examination was non-focal (Tr. at 360, 361). She was told to continue Treximet (Tr. at 362). In January 2018, Claimant told Ms. King that her headaches hurt "all over," that she "stay[s] in bed all of the time," and that she was "[t]rying for disability" (Tr. at 537). She complained of pain mopping, vacuuming, and getting groceries (Id.). Ms. King refilled Treximet and continued Neurontin and Propranolol (Tr. at 538). In April 2018, Claimant again claimed she had headaches every day "all over" and trying to get disability for headaches (Tr. at 522). On examination, Claimant was tender along the entire spine with weak head turning, but Ms. King felt she gave minimal effort on examination (Tr. at 523). A neurological examination was non-focal (Tr. at 526). Ms. King continued Claimant on Propranolol and refilled sumatriptan (Id.).

On April 2, 2018, Claimant met with West Virginia University (WVU) neurologist David Libell, M.D., for daily chronic headaches for about a year, associated with nausea, vomiting, photophobia, and phonophobia (Tr. at 577). Claimant also reported facial numbness and tingling when her headaches were bad (Id.). On examination, Claimant was in no apparent distress, had normal memory, attention, and knowledge, and a normal neurological examination (Tr. at 579-580). Dr. Libell advised her to discontinue her current medications because they were not helping, started her on zonisamide, and set her up to be seen in the headache clinic (Tr. at 580).

On April 30, 2018, Claimant saw David Watson, M.D., at WVU (Tr. at 582). Claimant stated that she had daily headaches, and that 28 of them per month were severe (Id.). She rated them as 10/10 in terms of pain (Id.). On examination, Claimant had normal orientation, memory, attention, language, and fund of knowledge; her neurological examination was normal (Tr. at 584). Dr. Watson adjusted Claimant's medication (Tr. at 585). A brain MRI a few days later showed

minimal chronic small vessel ischemic changes and no acute intracranial abnormality (Tr. at 567).

On June 27, 2018, Claimant once again reported to Ms. King that she had a "migraine daily, all over" (Tr. at 518). Claimant also reported other pain complaints, but on strength testing, Ms. King did "not feel she is giving very good effort at this task" (Tr. at 519). On examination, Ms. King noted that when she barely touched Claimant, Claimant reported pain (Id.). When Ms. King first entered the room, Claimant "moved freely from exam table to chair to show [her] a form," but when she left the room, "she walked slowly, stiff legged" (Id.). Ms. King told Claimant, "I do not know why you now say you can not walk or do your daily household and independent ADLS? [B]efore you played soccer with your kids. I do not think you meet qualifications for disability" (Id.). She refused to order a rolling walker, despite Claimant's request (Id.). She told Claimant that she could speak to a headache specialist about pain management (Id.). Ms. King then told Claimant, "As I told you previously, we do not complete functional capacity evaluations here" (Tr. at 520).[3]

On July 18, 2018, Claimant reported to Kristina Lopez, M.D., of WVU that her headaches had improved (Tr. at 587). She still had daily headaches, but they were less severe (Id.). She stated that she now only had 15 severe headaches per month (Id.). She reported vision changes only when her headaches were severe, which had occurred since she was 16 (Tr. at 588). She reported that she would retreat to a dark, quiet room and try to sleep off headaches (Id.). Claimant was oriented, with good memory, attention, knowledge, and language (Tr. at 589). Dr. Lopez put in an

---

[3] Around this same time, on June 6, 2018, Claimant had an initial visit with a psychiatrist for mental health complaints, at which time she reported a history of migraines (Tr. at 515). At this appointment, Claimant reported being active at church and attending her son's soccer games (Tr. at 516). Her husband was a surveyor and frequently worked out of town (Id.). The provider adjusted her medication and recommended she engage in regular exercise or activity (Id.).

authorization for Botox (Tr. at 590). Claimant returned for Botox injections on July 31, 2018 (Tr. at 592-593).

On August 28, 2018, Claimant met with a new primary care provider, nurse practitioner Jennifer Armstrong, at the Bluefield Clinic (Tr. at 685). Claimant reported seeing a neurologist for migraine management and receiving Botox every three months; she said most of her day was spent in bed due to migraines (Id.).

On October 30, 2018, Claimant returned to Dr. Lopez and received her second Botox treatment, and on January 29, 2019, she had her third Botox treatment (Tr. at 631-632, 662-663).

At appointments in March, June, and October 2019, Claimant again reported to Ms. Armstrong that she was seeing neurology and receiving Botox injections (Tr. at 671, 739, 743). One time, she stated she did not feel well after her injections but was diagnosed with acute sinusitis (Tr. at 675). On another occasion, she reported left eyelid drooping after an injection (Tr. at 739). She was to follow up with her neurologist (Tr. at 672, 687, 740, 744).

Weight Loss Treatment:

Claimant also met with a weight loss provider during the relevant period, at which time she mentioned her headaches and activities. For example, on February 24, 2016, Claimant met with nurse practitioner Deborah Croy, noting that she was "very active" and was "coach[ing] her sons" (Tr. at 435). In May 2016, Claimant made another visit with Ms. Croy, reporting that she decreased Topamax (her headache medication) due to side effects (Tr. at 422). She had tried phentermine in the past, but it made her gain weight (Id.). Claimant was exercising with Wii-Fit and was very active every day; she walked, played soccer, and cut grass (Tr. at 422, 425). At her next appointment in August, Claimant was losing body fat through exercise (Tr. at 399).

In October 2016, Claimant reported to Ms. Croy that she had recently started on Elavil for migraines and started gaining weight (Tr. at 390, 395). She said she had not noticed any change in the frequency of her migraines, and her doctor advised her not to stop the medication until she discussed with her neurologist (Tr. at 390). Even so, Claimant was still at the same activity level, and she lost two inches on her waist (Id.). At her next visit in April, Claimant reported walking five miles a day (Tr. at 380; see also Tr. at 491).

From July to October 2017, Claimant met with Ms. Croy once per month (Tr. at 357, 545, 551, 556). In July, Claimant reported a headache that day, but she had been hiking (Tr. at 357). Claimant had taken her medication, Neurontin and Imitrex, but claimed it was not working for her, and she wanted an injection (Id.). Ms. Croy adjusted her medication dosage and told Claimant to let them know if her headaches did not improve (Id.). The next month, Claimant reported that she was walking and playing soccer with her son (Tr. at 556). In September, Claimant told Ms. Croy that she continued to gain weight although she was walking, lifting weights, and playing soccer (Tr. at 551). In October, Claimant reported that she continued to walk (Tr. at 545).

State Agency Medical Consultant Opinions:

On October 18, 2017, Narendra Parikshak, M.D., reviewed the record and opined that Claimant could perform medium exertional work; frequently perform postural maneuvers; and should avoid concentrated exposure to extreme cold, vibration, and hazards (Tr. at 81-82, 93-94). On December 13, 2017, Fulvio Franyutti, M.D., affirmed Dr. Parikshak's findings (Tr. at 105-106, 115-116).

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that she quit her job in December 2015 due to migraines (Tr. at 43-44). She said that when she quit, she was getting migraines almost daily, suffering from absenteeism, and a co-worker was doing her work (Tr. at 44, 56-57). She testified that she has migraines about every day, with "bad" migraines once per week (Tr. at 48, 56). Claimant stated that when she has a migraine, her vision is blurry, light bothers her, and she has nausea and vomiting (Tr. at 48). She claimed that one migraine can last two or three days (Id.). Claimant testified that her headaches caused her to stay in bed all day long, five days out of seven per week (Tr. at 53). She also testified that for the past two years, she spent her days sleeping due to her medications (Tr. at 53-55; see also Tr. at 51).   She also said a "regular" headache takes four to five hours to resolve after lying down, whereas a "bad" headache causes her to be bedridden (Tr. at 55-56).

With respect to her treatment, Claimant testified that she received Botox injections, but she had a reaction the last time, and was planning to try Amivig injections (Tr. at 49). She also takes other medications for her migraines, which ease her headaches "just a little bit" (Tr. at 49-50, 55). Claimant had not received emergent treatment for headaches (Tr. at 51).

Claimant testified that when she drives, she needs someone with her at all times in case of a migraine (Tr. at 54). She stated that she is capable of caring, bathing, and dressing for herself. (Id.) She testified that her children help her around the house, and that she did not provide a lot of care for them on a daily basis (Tr. at 57-58). Claimant testified that she has a babysitter who comes to her house three to four times a week, even though she is home (Tr. at 62). Claimant stated that she goes to the grocery stores on days she can get out, but on bad days, she does not go anywhere

13

(Tr. at 57).

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume a person of Claimant's age, education, work experience, and with the controlling RFC, *supra*, to determine if she could perform other jobs. (Tr. at 65-67) In response, the VE testified that the individual could perform the work of an assembler, packer, or sorter, all light unskilled jobs. (Tr. at 67-68) The VE also testified that if the individual had to spend five days out of seven during the week sleeping, or off-task 11 to 20 percent of the workday, or absent two or more days a month, then the individual would be unable to maintain employment. (Tr. at 68-69)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Evaluation of Symptoms in Disability Claims and The RFC Assessment:

As noted *supra*, Claimant has not only argued that the ALJ's RFC assessment is not supported by substantial evidence due to the lack of an explanation for the limitations provided therein, discussed *infra*, but also to the extent that it fails to appreciate the significant progression of Claimant's symptoms from her migraines/headaches. Additionally, Claimant argues the ALJ did not properly consider her functional deficits stemming from the sedative effects caused by her medication.

Before delving into the RFC determination, it is important to recognize that Social Security Ruling ("SSR")16-3p clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 requires a finding of the extent to which an individual's statements about pain or other symptom(s) and its functional effects can reasonably be accepted as consistent with the objective medical evidence and other evidence; that explains the factors to be considered in assessing the consistency of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the consistency of the individual's statements.

The Ruling further directs adjudicators use a two-step process for evaluating an individual's symptoms: first, it must be determined that the individual has a medically determinable impairment ("MDI") that could reasonably be expected to produce the individual's alleged symptoms; and second, the intensity and persistence of the individual's symptoms must be evaluated to the extent which they limit the individual's ability to perform work-related activities. See, SSR 16-3p, 2016 WL 1119029, at *3-4. This evaluation must be based on a consideration of

all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons . . . Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and *side effects of any medication* you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) *Any measures you use or have used to relieve your pain or other symptoms* (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Id. §§ 404.1529(c)(3), 416.929(c)(3) (emphasis added).

The ALJ first reviewed Claimant's testimony concerning her problems associated with

migraines, including: that she quit her job at the bank because they caused her to have blurry vision, that she was getting them everyday, and she was suffering from absenteeism to the point that a co-worker ended up doing her work. (Tr. at 19) The ALJ noted that Claimant testified that she gets migraines everyday, with some lasting two or three days, that light bothers her so she has to be in complete darkness, and that she gets sick to her stomach and throws up because of the headaches. (Id.) The ALJ further noted that Claimant's children clean for her and that most days she is in bed due to headaches and that she is in bed the entire day for five out of seven days. (Tr. at 20) The ALJ acknowledged that in addition to always having some[one] with her while driving because a migraine makes her unable to see, she can take care of herself. (Id.) The ALJ also noted that Claimant testified that her migraine medication is what keeps her in bed because it made her sleepy. (Id.) Though her medication "helps some", it "does not take the headaches away; a typical headache takes four or five hours to resolve, but a bad one, which Claimant has usually every week, leaves her bedridden. (Id.)

The ALJ continued her review of Claimant's testimony, that her headaches started getting worse six or seven years ago, and had it not been for the accommodations provided by her coworkers, it would have been difficult for her to keep her job. (Id.) It was also noted that Claimant's headaches have no pattern to them, and she does not perform much care for her children – her daughter will soon be 12 and prepares meals and cleans. (Id.) The ALJ noted Claimant will try to go to the grocery store on good days and that lying down helps with the headaches, as does the use of a heating pad. (Id.) Claimant has a babysitter come to her house three to four times a week, even though she is home, to help care for her children because of her headaches; the babysitter also drives with Claimant. (Id.)

17

Next, following his review of the objective medical evidence of record, the pertinent portion referenced *supra*, the ALJ performed the requisite credibility/consistency analysis endorsed by <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1995). (Tr. at 20-28) The ALJ determined that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and provided an explanation (Tr. at 26):

Noting that Claimant testified she quit her bank job due to migraines, and that she had blurry vision, the ALJ also noted a July 2018 treatment record that indicated Claimant suffered from blurred vision due to headaches since she was 16 years old – but Claimant did not complain of problems performing tasks due to vision issues. (<u>Id</u>.) Of interest here, the ALJ did acknowledge that Claimant testified she stayed in bed five out of seven days because of migraines, but she also testified that her headache medicine made her sleepy; the ALJ noted that the record shows Claimant tried numerous headache medications, "and presumably not all of them made her sleepy." (<u>Id</u>.) The ALJ also observed that "[t]he record in fact does show her complaining of great drowsiness on a chronic basis from medication." (<u>Id</u>.)

The ALJ also compared treatment notes from the relevant period: in August 2016, Claimant reported to her provider that the best relief she got from headaches was resting in a dark room; in January 2018, she would stay in bed all the time due to headaches; in July 2018, she would stay in a dark room to try to sleep off headaches; in August 2018, she reported to a new provider that she spent most of the day in bed due to migraines; however, in July 2016, Claimant "only reported she sometimes had a migraine during the day, and that she had migraines once a week. She did not indicate then, or earlier, being bed-ridden from headaches." (<u>Id</u>.) Significantly, the ALJ noted:

18

In the months right before the alleged onset date, she did not indicate intense headache issues, or even worsening of her headaches, which she had suffered since age 16. Although the later record indicates this did not last, at the time of the alleged onset date, in January 2016 and shortly before, she simply reported Topamax was helping.

(Id.) The ALJ also noted that Claimant did not report to her providers in "January 2016 or later" that she quit her job due to headaches, and that throughout 2016, she was "focused on weight loss" and she reported being active with exercise and coaching soccer. (Id.) Although the ALJ acknowledged Claimant reported daily headaches during the month of June 2017, it was noted that she failed to refill her Imitrex medication and that her provider recommended that she "take the full amount." (Id.) The ALJ then determined:

The claimant's testimony and some reports to providers of being in bed much or most of the time is not consistent with her activity. She reported her husband was out of town frequently, indicating she would have significant caretaking responsibilities. Although she alleged in testimony her currently 11-year-old daughter helped with chores, the claimant would have to provide substantial caretaking even if this were the case, and the record does not show her reporting this to providers.

(Id.) With regard to Claimant's alleged progression in the severity of her migraine symptoms, the ALJ noted that in March 2017, while Claimant reported her migraines had been worsening, she also "had been providing even more care because her husband had injured himself, and she was taking care of the children. She was also helping a neighbor then." (Tr. at 26-27) The ALJ acknowledged that although Claimant reported nausea at times, but not general vomiting, she had frequent headaches and would sit in a dark room for the severe headaches, she could nevertheless, take on the additional caretaking and engage in "substantial activity, including exercise." (Tr. at 27) The ALJ did note that Claimant's primary care provider did not think she was disabled because of headaches. (Id.)

Clearly, from the foregoing, the ALJ considered the sedative effects from Claimant's migraine medication, thus to the extent Claimant has asserted otherwise, that argument lacks merit. Moreover, the ALJ appropriately acknowledged that Claimant herself reported (and testified) on numerous occasions throughout the relevant period that she would retire to her bed in order to get relief from her headaches. In short, the ALJ's assessment of Claimant's alleged symptoms from her migraines and/or headaches complies with the Regulations and Ruling concerning the evaluation of same. This included the ALJ's reconciliation between Claimant's alleged symptomology and side effects from her medication and the objective medical and other evidence of record – that despite the more recent allegations of being bed-ridden, whether it was due to headaches, migraines, or even side effects from medications, Claimant's activities, which included caring for her children, husband, or her neighbor, exercising, coaching soccer, etc.,[4] during the relevant period simply did not support such limitations.

Again, as noted *supra*, Claimant has also alleged that the RFC assessment is flawed because the ALJ did not provide the necessary narrative discussion as to how the evidence supports her conclusions. It is well known that a claimant's RFC represents the *most* that the individual can do despite her limitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). Moreover, the RFC

---

[4] Claimant also alleged in her Function Reports that when able, she cooks, cares for pets, goes to church, visits her neighbors, and attends her children's activities (Tr. 293-294, 296, 301-302).

determination is an issue reserved to the Commissioner. Id. §§ 404.1546(c), 416.946(c).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted); see also Felton-Miller, 459 Fed. App'x at 231.

To the extent that Claimant is arguing that the RFC assessment is not supported by substantial evidence because it contains limitations for her migraines that are not explained or supported by medical evidence, it is important to recall this Circuit has recognized that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision" Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). Instead, an ALJ " 'must build an accurate and logical bridge from the evidence to his conclusion.' " Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). As noted supra, the ALJ provided a comprehensive review of the record evidence, which included Claimant's testimony and subjective statements, her daily activities, the objective medical findings, the treatment history, including the medical opinion evidence. As noted by Claimant, the ALJ determined that "[h]er headaches indicate she should not be carrying heavy amounts, and that she should not be exposed to hazards and loud noises. With these accommodations, she would not suffer absenteeism more than a day a month." (ECF No. 20 at 7, citing Tr. at 27) Claimant also points out that the one day of absenteeism is the maximum tolerable level allowed identified by the vocational expert during the hearing. (Id., citing Tr. at 66, 68)

For starters, the ALJ's maximum allowable absenteeism of one day a month finds support in the vocational expert's testimony, which is undisputed. Regarding the prohibition against exposure to loud noises, though the record is replete with Claimant's reports of sensitivities to light and that she will go to a dark room for relief, the ALJ made at least a couple of express citations to the medical record indicating Claimant had sensitivity to "sound" as well. (Tr. at 21, 340-351[5]; Tr. at 25; 577-641, "She would retreat to a dark, quiet room and try to sleep off headaches."[6]) As for the restriction to any exposure to hazards, the ALJ pointed out numerous instances in the record when Claimant repeatedly alleged vision issues associated with her migraines; Claimant even testified that she has someone drive with her or has someone drive her, not only because of her vision problems, but also because she does not know when she will have a bad migraine. To that end, the ALJ's restriction against hazards[7] is not just well supported by the overall evidence of record, it is reasonable. Finally, with regard to the lifting restriction, that "she should not be carrying heavy amounts", while the association between heavy lifting and Claimant's migraine impairment is unclear, Claimant also alleged problems with her back[8], thus, the ALJ made restrictions to accommodate those limitations (Tr. at 27, "the light exertional level accommodates her lumbar degeneration and obesity.") Regardless, Claimant does not demonstrate how the lifting restriction prejudices her RFC as it pertains to the migraine impairment.

---

[5] The ALJ referenced the records from the Carilion Clinic, Roanoke Neurology; the undersigned notes that Claimant reported sensitivity to both light and sound during a visit on August 12, 2016 (Tr. at 348).
[6] The ALJ was quoting nearly *verbatim* from the medical records from WVU, which showed that Claimant reported photophobia and phonophobia in April 2018 (Tr. at 577, 582).
[7] As noted *supra*, the ALJ prohibited Claimant's exposure to extreme temperatures, hazardous machinery, working at unprotected heights, climbing ladders, ropes, and scaffolds as well as working on vibrating [surfaces] (Tr. at 19).
[8] Claimant does not mention any issues with respect to her back impairment in this appeal, however, the ALJ's decision also extensively covers Claimant's allegations related thereto, as well as the accompanying medical record and treatment for this impairment.

Overall, the ALJ determined that based on the record, Claimant's migraine impairment is sufficiently accommodated by the RFC as assessed, *supra*. The undersigned notes that in Hines v. Barnhart, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing Craig v. Chater, 76 F.3d at 595).

Recently, the Fourth Circuit emphasized the adjudicator's role in evaluating subjective symptoms: "an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." See Arakas v. Comm'r, Soc. Sec. Admin., 983 F.3d 83, 98 (4th Cir. 2020) (internal citations omitted). The Fourth Circuit "reiterate[d] the long-standing law in our circuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms." Id. It is important to recognize that in Arakas, the Court concluded that substantial evidence did not support the ALJ's finding that the claimant's subjective complaints were inconsistent with her daily activities because the overall record actually supported her subjective complaints and demonstrated she would be unable to engage in substantial gainful activity. Id. Another significant, if not critical, aspect of the Arakas holding is that the Court found the ALJ's analysis included misrepresentations or overinflation of the claimant's abilities, to the exclusion of that evidence which did not support such a conclusion. Id. For purposes herein, this Court must determine if the subject ALJ's analysis relied primarily on the lack of objective medical evidence as the reason for discounting Claimant's complaints.

The foregoing demonstrates that the ALJ in this case did not overinflate Claimant's capabilities while ignoring the evidence tending to support her allegations of functional limitations; the ALJ herein did not make factual misrepresentations or misinterpretations of the evidence of record in order to make a nondisability finding. Indeed, given the conflicting evidence consisting of Claimant's allegations of pain and other symptoms with the objective and other evidence of record, the ALJ is solely responsible for resolving the conflict; the issue before the Court is not whether Claimant is disabled, but whether the ALJ's finding is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Craig v. Chater, 76 F.3d at 589. In this case, it appears that the ALJ paid close attention to the objective medical evidence from the relevant period, which included Claimant's reports of pain and other symptoms, or lack thereof, as well as what helped her pain and other symptoms, and what did not relieve them; the ALJ then compared this evidence to Claimant's current allegations of pain and other alleged symptomology.[9]

In short, the ALJ's discussion involved a thorough review of the conflicting medical and other evidence requiring some reconciliation. Accordingly, the undersigned **FINDS** that the ALJ's assessment of Claimant's subjective complaints is supported by the substantial evidence. Moreover, the ALJ's narrative of the record included the objective medical evidence, as well as the other evidence of record, including Claimant's own statements and testimony; the ALJ's thorough discussion of all this evidence, and the ultimate determination that Claimant remained

---

[9] Upon judicial review, the Commissioner's factual findings are " 'conclusive' if supported by 'substantial evidence.'" See Biestek v. Berryhill, 139 S.Ct. at 1153 (2019). Moreover, given that substantial evidence is "more than a mere scintilla" and "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. at 1154 (internal quotation omitted).

capable of performing light work provided sufficient explanation allowing for meaningful judicial review. <u>Mascio v. Colvin</u>, 780 F.3d 632, 636 (4th Cir. 2015). This Court is not "left to guess about how the ALJ arrived at [her] conclusions" therefore remand is not necessary. <u>Id</u>. at 637.

The undersigned therefore **FINDS** that the RFC assessment as it relates to her migraine impairment is supported by the substantial evidence. The undersigned further **FINDS** that the final decision is also supported by the substantial evidence.

## <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 19), **GRANT** the Defendant's request to affirm the decision below (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 7, 2021.



Omar J. Aboulhosn
United States Magistrate Judge